In re Christina Joy CLEVENGER,
Debtor.

Christina Joy CLEVENGER, Plaintiff,

v.

NEBRASKA STUDENT LOAN PRO-
GRAM, Mohela, Eduserve, Sallie Mae
Loan Center, and United Student Aid
Funds, Inc., Defendants.

Bankruptcy No. 96–30469.
Adversary No. 97–3003.

United States Bankruptcy Court,
W.D. Missouri.

June 13, 1997.

Christina Joy Clevenger, pro se.

Mark Schultz, Gallas & Schultz, Kansas City, MO, Richard Beheler, Blackwell, Sanders, Matheny & Weary, Kansas City, MO, for Defendants.

## MEMORANDUM OPINION

ARTHUR B. FEDERMAN, Bankruptcy Judge.

On January 21, 1997, debtor Christina Joy Clevenger (Ms. Clevenger or debtor), appearing *pro se*, filed an adversary proceeding to determine the dischargeability of her student loans. Defendant EDUSERVE has assigned its loans to Nebraska Student Loan Program (NSLP), and defendant Sallie Mae Loan Center has assigned its loans to United Student AID Funds, Inc. (USAF). They, therefore, did not answer the Complaint and a default judgment was entered in favor of Ms. Clevenger as to those two defendants on April 15, 1997. The Missouri Higher Education Loan Authority (MOHELA) assigned its loans to the Missouri Coordinating Board for Higher Education (MCBHE), which filed an answer on its behalf. USAF filed an answer on February 28, 1997, and the proceeding was set for trial on May 21, 1997. No representative from USAF was present at the trial on May 21, 1997. I, therefore,

entered a default judgment in favor of Ms. Clevenger as to the debt to USAF. On May 29, 1997, USAF filed a motion to set aside the default judgment, based on excusable neglect.[1] On June 11, 1997, USAF filed a Motion for Summary Judgment on the Complaint, and it filed a Motion for Default Judgment on its counterclaim for damages. At trial, Ms. Clevenger offered evidence to prove that excepting her obligations from discharge would impose an undue hardship on her and/or her dependents. This is a core proceeding under 28 U.S.C. § 157(b)(2)(I) over which the Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(b), 157(a), and 157(b)(1). For the reasons set forth below, I find that requiring Ms. Clevenger to repay any of her obligations would impose an undue hardship on her. Therefore, the debts are dischargeable pursuant to 11 U.S.C. § 523(a)(8)(B). Given my finding that requiring her to repay the NSLP and the MCBHE loans would impose an undue hardship, the motion of USAF to set aside the default judgment discharging obligations due it will be denied.

The Motion for Summary Judgment turns on Ms. Clevenger's failure to respond to a Request for Admissions asking her to admit that excepting the USAF debt from discharge "will not impose an undue hardship on you and your dependents."[2] Since that is the ultimate legal conclusion to be determined by the Court, Ms. Clevenger's failure to respond to the Request for Admission is not determinative. Given that a trial was held on the merits, prior to the filing of the Motion, the Motion for Summary Judgment will be denied.

As to USAF's Motion for Default Judgment on the counterclaim for damages, debtor has acknowledged her obligation to USAF. However, that obligation is to be discharged. Therefore, that motion will be denied as well.

### FACTUAL BACKGROUND

Ms. Clevenger filed a Chapter 7 bankruptcy petition *pro se* in this Court on July 26, 1996. At all times since filing, Ms. Clevenger has appeared *pro se*. In conjunction with her bankruptcy petition, she also filed an adversary proceeding to determine the dischargeability of her student loans. Before that adversary could be litigated, however, Ms. Clevenger and her two children moved to California where her mother resides. The adversary was dismissed without prejudice when Ms. Clevenger failed to respond to an Order to Show Cause. She then filed this adversary proceeding from California and asked this Court to transfer venue of both the adversary and her bankruptcy case. This Court refused that request. The Court was then notified by Ms. Clevenger's mother that Ms. Clevenger had been arrested in California on March 10, 1997, for removing her children from the jurisdiction of the State of Missouri in direct disregard of a Court Order. According to Ms. Clevenger's mother, she was held in California for "several weeks" before being extradited to Missouri, where she was incarcerated in the Jackson County, Missouri Detention Center. At the hearing on May 21, 1997, Ms. Clevenger testified that she was released on bond from the Detention Center around May 10, 1997. She stated she will be tried for child abduction, which is a Class D Felony, and she also must appear in civil court for contempt. At this time, she said, her former husband has custody of her two children.

She proceeded to tell the Court that she left Missouri when her car was repossessed and she was unable to continue making payments on a home she was purchasing pursuant to a contract for deed. She said her mother and stepfather live in California, however, they are unable to provide financial assistance. A congregation in California supplied Ms. Clevenger and her children with shelter, and she was on welfare until her arrest. Ms. Clevenger appeared to be quite rational during her testimony, though she became agitated when talking about her children. She made reference several times to an older child that was removed from her custody a number of years ago. She is very aware of the possibility that she might also lose custody of these two children.

---

**1.** Fed.R.Civ.P. 60(b) as made applicable to this bankruptcy proceeding by Fed. R. Bankr.P. 9024.

**2.** Doc. # 28.

Ms. Clevenger then discussed her student loans. She stated that she began incurring student loans for the purpose of improving her education in 1982. She ultimately graduated in 1989 with a Bachelor of Science Degree in Management Accounting from Park College. She was, however, unable to find or maintain a job. She and her former husband filed a Chapter 7 bankruptcy petition in 1989, and they obtained a discharge in May of 1990. Many of the student loans at issue in this case were in existence at that time, but Ms. Clevenger made no attempt to discharge them. She testified on more than one occasion that she wanted to improve her education in order to get a good job. She said she came from a poor family, and she really believed if she was educated she would be able to earn a good living. She consolidated her student loans in 1991, at about the time she and her husband were divorced. She stated she believed her student loans totaled approximately $27,000 at the time of consolidation.

Ms. Clevenger testified that she did not get a job in management accounting after receiving her degree. She then incurred additional student loans when she returned to school in order to earn a master's degree. She obtained a Master of Science and Public Affairs Degree in 1994, but she was still unable to find employment in her field. Between 1982 and 1996 Ms. Clevenger incurred in excess of $94,000 in student loans, yet she has never been able to keep a job for more than a couple of months, and she has never obtained a job in her field. Despite this dismal record, she remained optimistic that yet one more degree would suddenly make her an attractive job candidate. So she returned to school again in January of 1996, and she borrowed the $8100 now assigned to MCBHE. Ms. Clevenger went back to school full time at Southwest Missouri State University (SMSU) to earn a Master of Arts in Management Accounting (MAMA). Ms. Clevenger testified that the MAMA program requires full-time attendance for 18 months. She wanted to complete the program in order to sit for either the Certified Public Accountant (CPA) or the Certified Management Accountant (CMA) examination. She obtained a student loan from the Missouri Student Loan Program in the amount of $8100 to attend school for the Winter Semester. I note that at the time Boatmen's Bank made this most recent student loan, Ms. Clevenger already owed over $94,000 in student loans, she was unemployed, and she had been unable to find a permanent job in the field of management accounting despite having a master's degree. There is no evidence that Boatmen's requested any information concerning the amount of other student loans owed by Ms. Clevenger before making this loan.[3]

SMSU offered Ms. Clevenger a temporary part-time teaching position during the 1996 Winter semester at a salary of $3600. Ms. Clevenger testified that she liked teaching, though she worked 40 to 70 hours a week. She also said she thought she did a "fair" job, but the professor who hired her informed her in March that she would not be teaching for the university after the semester ended. Apparently, with no prospect for a part-time job at SMSU, Ms. Clevenger made no arrangements to return to school and complete the MAMA program. She also fell behind in her car payments at about this time. She filed for bankruptcy relief shortly thereafter.

Ms. Clevenger's bankruptcy schedules indicate she had no money at the time of filing. She filed *pro se*, claiming she could not afford an attorney, and she arranged to pay her filing fee in $25.00 installments. Before her discharge was entered on December 13, 1996, her phone was disconnected, and her car, home, and four horses were repossessed. Ms. Clevenger listed $23,336.53 in unsecured nonpriority debt on her bankruptcy schedules, other than her student loans. In addition, NSLP claims a debt in the amount of $53,911.91. MCBHE claims a debt in the amount of $8,377.27, and USAF claims a debt in the amount of $40,485.31.

At the hearing, Ms. Clevenger testified in detail about her inability to get and keep jobs of any kind. She is no longer optimistic that she will be able to have a job that allows her

3. Indeed, on October 21, 1996, Boatmen's interest in this obligation was purchased by the guarantor, MCBHE. Motion of MCBHE for Summary Judgment, Ex. A.

to utilize her education. Based on my observation of her and her situation, I find that she will be unable to get and keep permanent employment in the foreseeable future. She stated she would like to take the postal exam and work for the Post Office. Her primary concern right now, however, is to regain custody of her children. She stated that she has been engaged in a continuous custody battle for her children since her divorce in 1991. In fact, in addition to her student loans she listed as priority unsecured debts in her bankruptcy case two contempt citations, one for $3699 and one for $4500, related to her ongoing legal battles. The impending trial for child abduction is a continuation of this domestic war.

Since 1991, Ms. Clevenger has regularly obtained forbearance of her obligation to repay her student loans, due to her financial situation and her continuing custody fight. With each forbearance the amount of her monthly payments at the end of the forbearance period has increased due to accruing interest.[4] In order to repay the student loans, Ms. Clevenger would now have to make payments in excess of $800 a month for 20 years. Counsel for NSLP calculated that Ms. Clevenger would have to pay it $473.40 a month, and counsel for MCBHE calculated that Ms. Clevenger would have to pay it $61.00 a month. As indicated, counsel for USAF did not appear, but its Motion for Summary Judgment states that interest alone on its debt is $9.51 per day, or $285.30 per month.[5]

Ms. Clevenger testified that entry level jobs in her field pay between $12,000 and $18,000 a year, hardly enough to pay her student loans and taxes and leave sufficient monies to maintain a minimal standard of living. It is also noteworthy that Ms. Clevenger is unemployed, earning no money at this time. Though she stated she is willing to take any kind of job offered, her annual income for the last five years has never exceeded $11,000. She testified that she earned $5,368 in 1996; $11,000 in 1995; $3,000 to $4,000 in 1994; $5,000 to $6,000 in 1993; and $5,000 to $6,000 in 1992. During these periods she was receiving $279 a month child support for each child, and she included these funds in her income calculation. She also stated that she drove a truck for a while when her children were young enough to travel with her, but she now has emphysema, which prevents her from driving. She stated she was diagnosed with emphysema in 1994, which requires treatment, and drivers who require "oxygen" or "breathers" are not eligible to drive "over-the-road." She also acquired some horses just before her bankruptcy filing, and was going to give riding lessons. According to her schedules, however, she never earned more than $34 a month in that endeavor. She stated that even though she has approximately 300 rejection letters, she was looking for a job in California at the time of her arrest. She has no employment plans at the moment, due to the impending criminal trial. She did state, however, that she felt she has special skills when it comes to auditing both numbers and documents, as well as working with children. She said repeatedly at the hearing that she keeps applying for jobs, but she cannot make anyone hire her.

I note that Ms. Clevenger has been in my Courtroom on three separate occasions over the course of her bankruptcy case. She appeared angry and belligerent on the first two occasions. At the hearing on this matter, however, she appeared calmer, in control of her emotions, and focused on the task at hand. Many of the pleadings she has filed in this and other adversaries, however, do not demonstrate that same ability to focus. She has filed eighteen separate lawsuits in either this Bankruptcy Court or the District Court, many of which are related in some way to the fact that she lost custody of her oldest child approximately eighteen years ago. With the exception of this action relating to student loans, all other actions have been dismissed.

Ms. Clevenger began and ended her testimony with the admission that she has no savings, no credit, no assets, and no job. She stated she always intended to repay the student loans when she incurred them, as she

---

4. *See, e.g.,* Motion of NSLP for Summary Judgment, Ex. # 2, "Request for Forbearance."

5. Doc. # 28, Ex. C.

really believed she would find a good paying job. Now that her loans total over $100,000 with interest accruing, she states she can never repay them. She claims the above facts prove that forcing her to repay her student loans would impose an undue hardship on her.

## DISCUSSION

■ Section 523(a)(8) of the Bankruptcy Code (Code) precludes the discharge of educational loans, with two exceptions. The first applies to obligations that first become due more than seven years before the date of the bankruptcy filing.[6] The second applies when "excepting such debt from discharge . . . will impose an undue hardship on the debtor and the debtor's dependents."[7] Ms. Clevenger, therefore, must prove by a preponderance of the evidence that excepting her student loans from discharge would impose an undue hardship on her or her dependents.[8] Since there is no definition of undue hardship in the Code, it is in the discretion of the Bankruptcy Court to decide if the facts of a particular case warrant a finding of dischargeability of the debt. This court has adopted the standard for determining undue hardship set out in *Brunner v. New York State Higher Educ. Servs. Corp.,*[9] which requires the following three part showing: (1) debtor cannot maintain, based on current income and expense, a minimal standard of living for herself and her dependents if forced to repay the loans; (2) additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loan; and (3) debtor has made good faith efforts to repay the loans.[10] In order to have her remaining student loans discharged, Ms. Clevenger must satisfy all three prongs of the *Brunner* test.

■ Thus, a debtor must first prove that she cannot currently maintain a minimal standard of living if forced to repay her student loans. Ms. Clevenger was recently released on bond from the Jackson County Detention Center. She is unemployed and has no prospects for employment until after her trial for child abduction. Ms. Clevenger testified that her income for 1996 was $5,368. She included in that sum the child support payments she received from her former husband while she had custody of her two children. She was living in Eureka, California at the time of her arrest, and she testified that she and the children were on welfare while she looked for a job. Ms. Clevenger testified that she has attempted to secure a permanent job, and that she has over 300 rejection letters, but no one has been willing to hire her for longer than a short period of time. At this time, Ms. Clevenger has no assets. Her car was repossessed; her horses were repossessed; and she abandoned a home she was purchasing on a contract for deed. She has no savings account, no credit, nor does she have health insurance. She was diagnosed with chronic emphysema in 1994 and must take medication periodically for this lingering condition. She needs dental

---

6. 11 U.S.C. § 523(a)(8)(A).

7. 11 U.S.C. § 523(a)(8)(B), which reads as follows:

(a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt—

. . . . .

(8) for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, of for an obligation to repay funds received as an educational benefit, scholarship, or stipend, unless—

. . . . .

(b) excepting such debt from discharge . . . will impose an undue hardship on the debtor and the debtor's dependents.

11 U.S.C. § 523(a)(8).

8. *See In re Roberson,* 999 F.2d 1132, 1136 (7th Cir.1993); *Alliger v. Pennsylvania Higher Educ. Assistance Agency (In re Alliger),* 78 B.R. 96, 99 (Bankr.E.D.Pa.1987).

9. 831 F.2d 395 (2nd Cir.1987).

10. *Id.* at 396.

work, but is unable to pay for it. Ms. Clevenger testified without contradiction that her gross annual income has not exceeded $11,000 for the past five years.

Ms. Clevenger's only apparent regular source of income, according to her bankruptcy schedules, was the court ordered child support she received from her former husband. He was ordered to pay her $279.00 for each of her two children, but those payments ceased in November of 1996 when Ms. Clevenger removed the children to California. Ms. Clevenger testified that the children are currently living with her former husband. It is significant that this apparently bright woman, who holds a Master's Degree in Management Accounting, has never been able to obtain a permanent job in the past, that her income has never exceeded $11,000 since graduating, and that, with a possible felony conviction in her future, she has no immediate job prospects. Ms. Clevenger cannot now support herself at all, let alone repay her student loans. I find, therefore, that Ms. Clevenger cannot maintain a minimal standard of living if forced to repay her student loans satisfying the first prong of the *Brunner* test.

The debtor must next prove that additional circumstances exist that show that her inability to repay these loans is likely to persist for a significant portion of the repayment period. Defendants NSLP and MCBHE both indicated that the repayment period is approximately twenty years. Ms. Clevenger did not dispute that fact. In *Brunner,* the Second Circuit Court agreed with the District Court that debtor had shown no such additional circumstances.[11] Indeed, the debtor there was young, had graduated less than a year before filing her bankruptcy petition, and, though temporarily unemployed, had good prospects for future employment.[12] Here, Ms. Clevenger has not been consistently employed in the past, has never held a job paying a salary commensurate with the education she has received, and is presently unemployed. She is embroiled in custody battles and faces a potential prison term.

Even if she is not convicted, or if she is not sentenced to prison, nothing in Ms. Clevenger's past work experience indicates she will be able to obtain permanent employment or attain any level of job security. Ms. Clevenger holds a Bachelor of Science in Management Accounting and a Masters in Science and Public Affairs. Although educated, she has no reasonable prospect of enhanced income sufficient to enable her to ever repay her student loans. She testified that she has made diligent efforts to get a job by submitting applications and resumes for employment in areas both related and unrelated to her particular skills and interests. She states that she has received more than 300 rejection letters from prospective employers. While Ms. Clevenger stated she would like to obtain a job in auditing or working with children, I am convinced, based upon my observation of her, that she will be unable to get or keep a good-paying job in the foreseeable future.

■ In *Shankwiler v. National Student Loan Marketing (In re Shankwiler),* the Court held that the inability to obtain a good-paying job is an exceptional circumstance entitling a debtor to equitable relief.[13] I agree. In order to repay the student loans at issue here, Ms. Clevenger's circumstances would have to improve from having no income to having income sufficient to support herself and make payments totaling in excess of $800 a month over a period of 20 years. Nothing in Ms. Clevenger's past or present circumstances indicates she will ever earn enough money to make these payments. She earns no income now, and there is no basis for finding that her income will increase as time goes by. Further, her expenses, while minimal, will surely increase due to health costs related to her emphysema. I find, therefore, that her inability to find a job is an exceptional circumstance that makes it likely that her inability to repay these loans will persist for a significant portion of the repayment period.

■ Finally, Ms. Clevenger must prove that she has made a good faith effort to repay her student loans. This prong of the

---

11. 831 F.2d 395, 396–97 (2nd Cir.1987).

12. *See Id.* at 397.

13. 208 B.R. 701, 706–07 (Bankr.C.D.Cal.1997).

test reflects the fact that a student who receives government guaranteed educational loans " 'assumes an obligation to make a good faith effort to repay those loans, as measured by her efforts to obtain employment, maximize income, and minimize expenses.' " [14] Historically, to prove good faith, the debtor must have made efforts to make some payments.[15] But, the "mere failure to make minimal payments on a student loan does not prevent a finding of good faith where the debtor never had the resources to make payments." [16] Therefore, the test of a debtor's good faith takes into account her ability to pay, not just the fact of whether payment is made. The policy behind this test is that a "debtor may not willfully or negligently cause [her] own default, but rather conditions must result from 'factors beyond [her] reasonable control.' " [17] The debtor's efforts to pay must be looked at in light of the environment in which they occur. If a debtor first demonstrates that she cannot maintain a minimal standard of living without making any payments on her student loans, a history of repayment is not required to demonstrate good faith.[18] Ms. Clevenger has made that showing. She must also, however, demonstrate that she is actively minimizing her expenses and "making strenuous efforts to maximize personal income." [19] Ms. Clevenger has made that showing as well. She lives very frugally. It is not clear to this Court, in fact, how she purchases food based upon her current lack of income. She owns no assets. She has made several attempts to maximize her income, but she has not been hired, despite applying for a multitude of jobs. When she has been hired, she has been discharged within a short period of time. She was hired as a part-time teacher at Southwest Missouri State University, but was told after two months that she would not be retained. When she filed a previous bankruptcy petition she made no attempt to discharge her student loans, believing that she would be able to find a good job and repay them. Debtor did not file this bankruptcy without first attempting to find employment, request deferment of payment, and minimize expenses.[20] When she borrowed $8100 from the MCBHE as late as January of 1996, she hoped that a degree that would enable her to take the CPA or CMA examination would result in a good job. But, when she was told she would no longer have a teaching position while attempting to obtain this last degree, her desperate financial situation became a reality to her. She fell behind in her car payments, and filed bankruptcy shortly thereafter. I find that Ms. Clevenger has not been financially able to make payments on her student loan debt, and that she has used her best efforts to obtain employment, maximize income, and minimize expenses. I find, therefore, that she has made a good faith effort to repay her student loans.[21]

I am aware that certain defendants submitted discovery to Ms. Clevenger, and that

**14.** *Elebrashy v. Student Loan Corp. (In re Elebrashy),* 189 B.R. 922, 928 (Bankr.N.D.Ohio 1995) (citations omitted).

**15.** See *Dotson–Cannon v. Dept. of Educ. (In re Dotson–Cannon),* 206 B.R. 530, 535 (Bankr. W.D.Mo.1997). *See also In re Roberson,* 999 F.2d 1132, 1136 (7th Cir.1993); *Robinson v. United States Dep't of Educ. (In re Robinson),* 193 B.R. 967, 969 (Bankr.N.D.Ala.1996); *O'Brien v. Household Bank FSB (In re O'Brien),* 165 B.R. 456, 459–60 (Bankr.W.D.Mo.1994); *Myers v. Pennsylvania Higher Educ. Assistance Agency (In re Myers),* 150 B.R. 139, 143 (Bankr.W.D.Pa. 1993).

**16.** *Courtney v. Gainer Bank (In re Courtney),* 79 B.R. 1004, 1011 (Bankr.N.D.Ill.1987). *See also Shoberg v. Minnesota Higher Educ. Coordinating Council (In re Shoberg),* 41 B.R. 684, 688 (Bankr. D.Minn.1984); *Pennsylvania Higher Educ. Assistance Agency (In re Birden),* 17 B.R. 891, 894 (Bankr.E.D.Pa.1982).

**17.** *In re Roberson,* 999 F.2d 1132, 1136 (7th Cir.1993) (citations omitted).

**18.** See *Maulin v. Salliemae (In re Maulin),* 190 B.R. 153, 156 (Bankr.W.D.N.Y.1995).

**19.** *Ogren v. United States (In re Ogren),* 1996 WL 671356, at *4 (Bankr.N.D.Iowa 1996).

**20.** See *Shankwiler v. National Student Loan Marketing (In re Shankwiler),* 208 B.R. 701, 708–09 (Bankr.C.D.Cal.1997).

**21.** Some courts look at "the magnitude of the total debt structure, and then consider the personal, professional, and financial benefit which the debtor has derived and will derive from the education financed by the loans in question" as a policy test to be applied after the good faith test is satisfied. *See Woodcock v. Chemical Bank, NYSHESC (In re Woodcock),* 149 B.R. 957, 962 (Bankr.D.Colo.1993), *rev'd on other grounds,* 104

she did not respond to all of that discovery prior to trial. I am also aware that defendants did not choose to depose her prior to trial. While Ms. Clevenger has not been represented by counsel, I am satisfied that if all pretrial procedures had been followed to the letter, the desperateness of her circumstances would have come through even more clearly. Congress fashioned bankruptcy relief to discharge honest people from the burden of debts that they cannot realistically hope to pay in order for them to become productive members of society. Although I have found that Ms. Clevenger will not in the foreseeable future earn sufficient income to repay these loans, I strongly encourage her to put her past troubles behind her, and find a way to support herself at whatever level possible.

In sum, I find that debtor has met her burden of proving by a preponderance of the evidence that excepting her student loans from discharge would impose an undue hardship on her.

An Order discharging those loans will be entered this date. In addition, Orders will be entered denying the posttrial motions of USAF.

F.3d 368 (10th Cir.1996) (Table), (citing *North Dakota State Bd. of Higher Educ. v. Frech (In re Frech)*, 62 B.R. 235, 242–43 (Bankr.D.Minn. 1986)). Although not necessary to my holding, it is obvious that Ms. Clevenger has yet to derive any benefit from her education financed by the loans in question.